## GRIFFIN v. McKAY.

4-5750                                  135 S. W. 2d 850

Opinion delivered January 22, 1940.

*Madrid B. Loftin* and *Wilson & Wilson,* for appellant.

*Edwin B. Keith,* for appellee.

GRIFFIN SMITH, C. J. The question is whether the court erred in refusing to declare C. W. McKay and W. D. McKay trustees for appellant in respect of forty acres of land.

The Federal Land Bank of St. Louis foreclosed its lien on the land in question, appellees having purchased at the sale for $310.

Appellant alleged, and testified, that when foreclosure became inevitable she asked C. W. McKay to purchase the property for her, and that he agreed to do so and to allow her "ample" time within which to repurchase.

C. W. McKay testified that after numerous importunities he did agree to purchase at the foreclosure sale, but told appellant the transaction would be "without any strings on it;" that appellant said she wanted McKay to buy ". . . because I know you won't put Joe and me out." McKay admitted having told appellant that if he could make financial arrangements he would bid the property in ". . . and let her and Joe stay on the place." This occurred early in 1937 after summons had been served in the land bank case. The foreclosure sale was May 29, 1937. At that time, according to McKay, there were no oil activities near enough to affect values.

Appellant's suit was filed April 28, 1938. In an amendment June 11 it was alleged that "about five weeks ago" McKay informed appellant she had no interest in the land. Later she was dispossessed. The complaint alleged plaintiff ". . . had tendered and now tenders" the amount of money appellees paid for the property, with interest at ten per cent.

Prior to the discussions between appellant and appellees, appellant had executed a deed to the property in favor of Wade Kitchens.

In the final decree of March 14, 1939, there is the finding that "The court is of the opinion that the complaint of the plaintiff and her cause of action should be dismissed with prejudice for want of equity." Title to the land was quieted in the McKays.

When appellant was served with summons she took it to the law firm of McKay & McKay. Appellant insists she made several trips to the McKay offices; that certain papers (presumably the summons) were left with the attorneys; that the elder (C. W.) McKay had promised to take care of the matter, but later told her to take the papers to Wendell Utley.

C. W. McKay testified that he frequently sent cases to Utley, who was an attorney not associated with his firm. C. W. McKay's sister was an office assistant. McKay says he instructed Miss McKay to give the

papers to appellant if she came back again—"and to get rid of her." He admitted that ". . . when I sent her to Utley I thought our firm was representing her." The contention is made, however, that with delivery of the papers McKay considered his employment at an end.

Appellant's testimony sheds light upon the relationship. She said: "I went to see Col. McKay and told him my land was up for foreclosure and I had come to see him to see if he could save [it] and give me a chance to get it back, and he said, 'How much is it?' and I said it was $268 and some odd cents. He said he could if it wasn't any more than that."

It thus appears that appellant's purpose in contacting C. W. McKay was to induce him to purchase the land and hold it a reasonable length of time in order that she might redeem. There is testimony that oil activities later created a lease market. McKay admits he told appellant that if he could arrange to buy the property he would allow her and Joe to retain possession. He says that after the purchase was made appellant wanted him to buy a horse or a mule for her, and also to "furnish" for making a crop. He declined to do so. Appellant was not forced to move until she filed suit.

Dave McKay (C. W. McKay's son, and a member of the law firm) testified to having overheard conversations between his father and appellant. There was other testimony, some of which sustained appellant's claims that a trust in her favor arose by reason of the conduct and agreements of McKay.

If we should believe appellant and her witnesses to the exclusion of appellees, then unquestionably McKay's status was that of trustee. If, on the other hand, we accept appellees' construction of the transaction, the purchase was "without strings," and appellees were under no obligation to do more than permit appellant and Joe (appellant's son who has since died) to live on the land a reasonable length of time. If appellant wrongfully brought suit, her right of possession under the contract was abandoned.

The question is one of fact alone. The law is quite clear and would protect appellant if the transactions were as she and her witnesses testified. The chancellor found otherwise. In the light of the entire record it cannot be said that the decree was contrary to the weight of evidence.

Affirmed.